UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANIL BABBAR and SHALINI BABBAR, on behalf of A.B.,

*Plaintiffs*,

-against-

ANDERSON CENTER FOR AUTISM, GARNET COLLINS, and NADINE THOMPSON,

*Defendants*.

No. _____

**COMPLAINT & JURY DEMAND**

---

### THE ANDERSON CENTER FOR AUTISM BRUTALIZES A HELPLESS RESIDENT

1.    This case involves the appalling and serial abuse of a helpless, disabled young man. Limited in his ability to express himself verbally, A.B. suffered in virtual silence until a whistleblower informed Plaintiffs Shalini Babbar and Anil Babbar in August 2024 that their son was being abused by an employee of Defendant Anderson Center for Autism ("Anderson").

2.    Anderson's conduct, knowingly allowing its employee Defendant Garnet Collins to abuse A.B., violated federal law, New York State law, and basic notions of human decency. Mr. Collins' abuse was not isolated, but rather part of a pattern of systemic and deliberate misconduct targeting A.B. at an institution whose sole purpose is to protect and care for people with disabilities.

### PARTIES

3.    Plaintiff A.B. is an autistic young adult man residing in Queens, New York. He requires round-the-clock care and assistance with daily living activities. His father, Plaintiff Anil Babbar, and his mother, Plaintiff Shalini Babbar, together serve as his guardians.

1

4.    Defendant Anderson is a not-for-profit corporation organized under the laws of the State of New York, with its principal place of business located at 4885 Route 9, Staatsburg, New York 12580, where it provides residential services, educational and life skills training to minors and adults with autism spectrum disorder.

5.    Anderson receives federal funding[1].

6.    Specifically, Anderson receives federal financial assistance in receiving, at minimum, Medicaid funds.

7.    Anderson is therefore a covered entity within the meaning of Section 1557 of the Affordable Care Act and Section 504 of the Rehabilitation Act of 1973, and subject to the nondiscrimination provisions thereof.

8.    Defendant Garnet Collins was, at all relevant times, a Direct Support Professional and Shift Leader who worked in Chestnut House, the house where A.B. lived, at Anderson.

9.    Defendant Nadine Thompson (together with Mr. Collins, the "Individual Defendants") was, at all relevant times, a Resident Manager at Anderson. She directly supervised Defendant Collins and was responsible for supervising staff members in order to ensure that they provided appropriate disability care.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.

---

[1] *Title VI Plan for CDOT FTA Subrecipient*, Anderson Center for Autism, at 2 (Sept. 10, 2022), https://www.andersoncenterforautism.org/wp-content/uploads/2023/07/2019-Title-VI-Plan-revised-2022.pdf (indicating Anderson is required to comply with Title VI as a recipient of federal funds).

11.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

12.  Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Dutchess County, New York, within the Southern District of New York, and because Defendant Anderson maintains its principal place of business in this District.

## JURY DEMAND

13.  Plaintiffs demand trial by jury in this action.

## FACTS

14.  At all relevant times, A.B. lived in Chestnut House, a residential home operated by Anderson. A.B. also attended school at Anderson through the education program.

15.  Due to his autism, A.B. requires support for many aspects of daily living. This includes assistance with dressing and showering.

16.  A.B. also has food aversions and particularities because of his autism.

17.  A.B. has some verbal ability, but it is limited.

18.  Anderson, through its employees, was responsible for providing A.B. with this basic care, pursuant to state regulations and federal disability rights laws.

***A.B. Was Abused While in Anderson's Care and Anderson Did Nothing to Stop It***

19.  On August 11, 2024, Plaintiff Shalini Babbar received a text message from an Anderson whistleblower notifying her that her then 19-year-old son A.B. was being abused while in Anderson's Care.

20.  The text message included a video that had been recorded on June 5, 2024, depicting a staff member, Garnet Collins, abusing A.B.

21.    That 28-second video begins inside an Anderson residence, in which screaming can be heard from inside a room where the door is slammed shut. Seconds later, the door opens, and Mr. Collins can be heard yelling "go to your room" repeatedly. A.B. can be heard screaming "no," while Mr. Collins grabs A.B.'s genitals as the two emerge from the room. In the living room, in the full view of staff and whoever else was there, Mr. Collins then, still gripping A.B.'s genitals, pushes A.B. down the hall and into another room, all while A.B. screams "no" and uses both his hands to try and remove Mr. Collins' hand from his groin.

22.    As the video ends, A.B. can be heard screaming and calling for his mother.

23.    The Hyde Park Police Department investigated Mr. Collins after Plaintiffs Shalini Babbar and Anil Babbar reported the August 2024 abuse.

24.    Ultimately, Mr. Collins was charged with two crimes: the felony of endangering the welfare of an incompetent or physically disabled person in the first degree, and the misdemeanor of forcible touching of the sexual/intimate parts of another person.[2]

25.    Mr. Collins pled guilty and was sentenced to one to three years' incarceration.[3]

26.    This was no isolated incident.

27.    On information and belief, Mr. Collins regularly grabbed A.B.'s genitals as a method of controlling his behavior. Mr. Collins encouraged other Anderson staff to do the same.

28.    A.B. lost a considerable amount of weight after he first moved to Anderson in May 2021.

---

[2] *State Police charge Poughkeepsie man in abuse case*, New York State Police (Aug. 12, 2024), https://troopers.ny.gov/news/state-police-charge-poughkeepsie-man-abuse-case.
[3] Pirolo, Teresa. *Autism center abuse whistleblower says there are other victims*, Fox5 New York (May 7, 2025), https://www.fox5ny.com/news/exclusive-autism-center-abuse-whistleblower-says-other-victims.

29.    Even after he got back to a normal weight, he lost weight again in the months leading up to the sexual assault in August 2024.

30.    On information and belief, A.B.'s weight loss was due to abuse and starvation tactics employed by Mr. Collins to control A.B.'s autism symptoms.

31.    Mr. Collins targeted A.B. because of his food aversions and withheld food from him on this ground.

32.    On information and belief, Mr. Collins regularly used physical abuse as a way to control A.B.'s behavioral symptoms.

33.    The whistleblower observed Mr. Collins slapping and hitting Anderson residents, including A.B., and submitting them to cold showers.

34.    Likewise, police investigating Mr. Collins learned that another Anderson resident sustained visible injuries several times in 2023-2024. Asked who was responsible for scratches on his chin and below his right eye, the resident "pointed at Garnet and stated 'he did.'"

35.    In another video, also included in the whistleblower's text message to Plaintiff Shalini Babbar, Mr. Collins can be seen hitting another disabled young man in the head with an iPad, while the young man struggles to complete a learning activity.

36.    Mr. Collins employed these pervasive and severe tactics because of the residents' disabilities, as a method of control.

37.    The abuse was not inflicted by Mr. Collins alone.

38.    In August 2023, Plaintiff Shalini Babbar found out that another Chestnut House staff member had also assaulted A.B. by hitting him with a broom in the eye.

39.    Anderson leadership was also made aware of the broom incident as the abuse was reported.

40.    Mr. Collins and other Anderson staff regularly used physical abuse to control A.B. and other Anderson residents because of the nature and severity of their disabilities.

***Anderson Was on Notice of the Abuse and Did Nothing to Stop It***

41.    Nadine Thompson, a resident manager at Anderson who was Mr. Collins' direct supervisor, was aware of the abusive conduct and hostile housing environment that persisted in Chestnut House.

42.    On information and belief, Ms. Thompson's office was between Side A and Side B of Chestnut House, and she worked in close proximity to the residents.

43.    On information and belief, Ms. Thompson would regularly leave her office and visit the residence, about once a month.

44.    In May 2024, weeks before the videotaped incident of Mr. Collins abusing A.B., the whistleblower reported Mr. Collins' abusive behaviors to Ms. Thompson.

45.    Ms. Thompson did nothing in response to the whistleblower's report.

46.    On information and belief, Ms. Thompson witnessed Mr. Collins slap another Chestnut House resident before Mr. Collins was recorded grabbing A.B.'s testicles.

47.    Ms. Thompson did nothing in response.

48.    On information and belief, other leaders at Anderson would regularly visit Chestnut House.

49.    Neither Ms. Thomspon nor any other Anderson supervisor or leader did anything to stop Mr. Collins from abusing A.B.

50.    Anderson maintains a culture of silence, where misconduct is covered up. When the whistleblower reported the abuse he observed in May 2024 to Ms. Thompson, she told him, in sum and substance, that "what happens in Chestnut, ends in Chestnut."

51.     Instead of listening to him, Anderson fired the whistleblower, Emmerson Phiri, after he reported the abuse he had witnessed.[4]

52.     In his federal complaint against Anderson over his allegedly retaliatory termination, Mr. Phiri, alleges that from his first day on the job at Anderson, he "witnessed acts of cruelty that included starvation, assault, and grotesque sexual torture committed on individuals with autism and carried out by Anderson's staff in full view of others."[5]

53.     Mr. Phiri reported the various abuses he witnessed to members of Anderson's leadership team repeatedly.[6]

54.     But Ms. Thompson and other members of Anderson's leadership told Mr. Phiri to keep the abuses secret and discouraged him from speaking out further.[7]

### The Abuse Had an Immediate and Profound Impact on A.B.

55.     The same day they learned A.B. was being abused, Plaintiffs Shalini Babbar and Anil Babbar removed A.B. from Anderson and brought him to his father's home in Forest Hills, New York.

56.     Given A.B.'s needs, amplified by his traumatic experiences at Anderson, Plaintiffs could not take care of him alone.

57.     Since August 2024, Plaintiffs have paid considerable sums of money out of pocket for Applied Behavior Analyst ("ABA") and Board-Certified Behavior Analyst ("BCBA") therapists to be with A.B. throughout the day and to support Plaintiffs Shalini Babbar and Anil

---

[4] Complaint, *Phiri v. Anderson Center for Autism et al.*, 25 Civ. 5814 (S.D.N.Y. 2025), ECF No. 1.
[5] *Id*. ¶ 2.
[6] *Id*. ¶¶ 43-46.
[7] *Id*. ¶ 50-51.

Babbar in managing A.B.'s care, in addition to the costs of out-of-network psychiatric care and education related costs.

***In the Aftermath of the Abuse, A.B. Required Extensive Hospitalizations and Treatment***

58.     As a response to the trauma A.B. endured, his behaviors and autism symptoms significantly worsened.

59.     On October 27, 2024, following an intense aggressive episode on a walk with his mother and an ABA therapist, A.B. was taken to the Long Island Jewish Medical Center. He was discharged that day.

60.     The next day, on October 28, 2024, Plaintiffs had to call 911 in response to another aggressive outburst, this time at home. A.B. was taken to Queens Hospital Center where he was admitted to their Comprehensive Psychiatric Emergency Program ("CPEP") unit. At that time, it was agreed that A.B. would remain hospitalized because of "safety concerns with current behavioral decompensation."

61.     On November 1, 2024, A.B. was transferred to an in-patient autism unit for individuals in crisis at Kings County Hospital. A.B. remained there between November 1 and December 16, 2024. During this hospital stay, A.B. displayed several warning signs, including "saying the name Garnett (his abuser) needs time out," "saying he is a 'bad boy,'" "yelling 'stop it,'" "yelling 'No,'" and "saying 'It hurts/ Don't hold me down.'"

62.     One of A.B.'s doctors observed that "[A.B.'s] repetition of his assailant's name while appearing fearful and repetitive statements of 'no, it hurts' create high index of suspicion for intrusive and reliving symptoms of post-traumatic stress disorder."

63.     A.B. was diagnosed with posttraumatic stress disorder.

64.    On January 7, 2025, because his heightened needs could not be met without extensive wrap-around services and a specialized team, A.B. regressed and was hospitalized again.

65.    A.B. was readmitted to Kings County Hospital because of continued emotional dysregulation and aggression.

66.    After another psychiatric evaluation in April 2025, a doctor concluded that A.B. was still "severely impaired by his PTSD symptoms," and that A.B. was "exhibiting tremendous increase in self-talk around his abuser and re-playing the abuse." Likewise, "[h]e has been struggling with a severe increase in tantrums and aggression, which appear to be related to the trauma."

67.    A.B. was hospitalized again several times throughout the spring and summer of 2025. Between April 19 and April 28, 2025, he was hospitalized at Queens Hospital for aggressive behaviors. And he was again hospitalized between May 22 and May 29, 2025. Between June 16, 2025 and June 18, 2025, A.B. was hospitalized again, this time for "agitation" after he "p[]unched one of his caretakers." His aggression at that time "ha[d] been escalating for a few days."

68.    On June 22, 2025, A.B. was hospitalized for another two days. This time he returned to an emergency unit "with similar but increasing aggression in relation to . . . property in the house." Trauma history noted that A.B. was "[a]dmitted after behavioral decompensation in context of severe sexual/physical/emotional abuse at RTF by staff member."

69.    A.B. was again hospitalized in Kings County Hospital in July 2025.

70.    As these repeated hospitalizations and evaluations make clear, A.B.'s autism symptoms were exacerbated by the trauma of the abuse he was forced to endure at Anderson. The extent of his psychological and physiological injury as a result has been significant.

### A.B. Will Require Treatment for the Rest of His Life

71.    The intensive therapy A.B. now requires will be a lifelong undertaking.

72.    Treatment for individuals suffering from PTSD typically requires talk therapy, which A.B. cannot meaningfully participate in given his limited verbal abilities. As a consequence, the outlook for A.B.'s long-term recovery is unclear.

73.    Despite all the treatment he has received over the past year, both in and outside the hospital setting, A.B. regularly relives the trauma he experienced at Anderson. To this day, he regularly repeats his abuser's name, saying things like "Garnet's calling you" and "no no no! Garnet's calling you!" The abuse has had a lasting effect on A.B.

### Anderson Was Required to Provide Proper Disability Care

74.    Anderson was, at all relevant times, obligated to ensure that staff members assigned to support A.B. were adequately trained and equipped to provide appropriate care. Anderson manifestly failed to do so.

### Defendant Sanctioned Abuse That Was Explicitly Motivated by Discriminatory Animus

75.    Anderson staff routinely abused, assaulted, and neglected A.B. largely because of the nature and severity of his disabilities.

76.    Defendant Collins employed abusive tactics to control A.B. because of his behavioral challenges due to his autism.

77.    Defendant Collins treated A.B. differently than other residents because of the nature and severity of his disabilities.

78.    One symptom of A.B.'s autism is aggression.

79.     Defendant Collins targeted A.B. because of his aggression.

80.     Defendant Collins grabbed A.B. by his testicles as a way to manage A.B.'s aggressive behaviors.

81.     Defendant Collins also instructed other staff members that grabbing A.B. by the testicles was the best way to handle and manage his aggression.

82.     Upon information and belief, no other residents were grabbed by the testicles as a method of control.

83.     Another symptom of A.B.'s disabilities is food aversions and particularities.

84.     In response to A.B.'s food-related behaviors, which are manifestations of his disability, Defendant Collins used food deprivation as a method of control and abuse.

85.     Defendant Collins withheld food from A.B. specifically because A.B. required and received special meals, separate from the other residents.

86.     When A.B. would reject the food offered by Anderson, Defendant Collins directed staff not to provide him alternatives. Sometimes, Defendant Collins would force A.B. to eat what the kitchen had prepared, without offering alternatives, even when alternatives were readily available.

87.     Defendant Collins regularly caused A.B. to go to bed with an empty stomach.

88.     On information and belief, when A.B. would return from weekends with his family, Defendant Collins would immediately search his belongings so that he could confiscate any food A.B. brought home from his family home.

89.     Other Anderson staff observed Defendant Collins withhold food from A.B. as a method of control and abuse.

90.     Anderson leadership was on notice of the abuse and did nothing to stop it.

91.    As a result of the above, A.B. has endured years of horrific physical, emotional, and psychological suffering.

### FIRST CAUSE OF ACTION
**(Against Defendant Anderson)**
**Section 1557 – Affordable Care Act (42 U.S.C. § 18116(a))**
**Discrimination in Health Care on the Basis of Disability**

92.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

93.    Section 1557 of the Affordable Care Act ("ACA") prohibits discrimination on the basis of disability in any health program or activity that receives federal financial assistance.

94.    Anderson receives federal financial assistance in the form of Medicaid and is a health program or activity within the meaning of Section 1557 of the ACA.

95.    At all relevant times, Anderson operated one or more health programs or activities that receive federal assistance within the meaning of Section 1557 of the ACA and its implementing regulations, 45 C.F.R. § 92. Anderson's services regarding the administration of medication to its residents qualify as a health program or activity that receives federal financial assistance in the form of Medicaid, rendering Anderson subject to Section 1557 in the administration of that health program or activity.

96.    A.B. is a qualified individual within the meaning of Section 1557 of the ACA and was a qualified participant or beneficiary of Defendants' federally funded health program or activity.

97.    A.B. has a disability as defined under Section 504 of the Rehabilitation Act, having a mental impairment that substantially limits one or more major life activities, as incorporated in Section 1557 of the ACA.

98.     Rather than provide appropriate disability care, Defendant Anderson, through the Individual Defendants, abused, assaulted, and neglected A.B., motivated in substantial part due to the nature and severity of his disabilities.

99.     Defendant Anderson, through the Individual Defendants, discriminated against A.B. on the basis of disability. The above-alleged abuse was either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by Defendants Anderson and Thompson because of the nature and severity of A.B.'s disabilities and so that they could avoid providing A.B. the opportunity to participate in Anderson's activities, programming, and one-on-one care systems.

100.    As a direct and proximate result of Defendants' conduct, A.B. has suffered significant damages, including but not limited to physical harm and emotional distress.

101.    Defendants' conscious disregard for A.B.'s safety was willful, wanton, malicious, and cruel, meriting substantial punitive damages.

102.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

### SECOND CAUSE OF ACTION
**(Against Defendant Anderson)**
**Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**Discrimination on the Basis of Disability**
**Denial of Reasonable Accommodations**

103.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

104.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits discrimination against qualified individuals with disabilities by institutions whose programs or activities receive federal financial assistance.

105.    A.B. is a qualified individual with a disability as defined in 29 U.S.C. § 705(20)(B), having a mental impairment that substantially limits one or more major life activities.

106.    Defendant Anderson is an institution whose programs or activities receive federal financial assistance within the meaning of 29 U.S.C. § 794(b), and is therefore subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act.

107.    A.B. was qualified to participate in or benefit from the services, programs, and activities, provided by Defendants.

108.    Defendant Anderson was aware of A.B.'s disabilities and A.B.'s need for reasonable accommodations to ensure safe, meaningful, and equal access to Defendant Anderson's programs and services.

109.    Rather than provide appropriate disability care, Defendant Anderson, through the Individual Defendants, intentionally abused, assaulted, and neglected A.B., motivated by the nature and severity of his disabilities.

110.    Defendant Anderson, through the Individual Defendants, intentionally used significant and inappropriate force against A.B., with the intent of not wanting to "deal" with his disabilities.

111.    The physical abuse inflicted on A.B. was also motivated by Defendants' explicit desire to avoid having to "deal" with his disabilities. Instead of trying to address the source of his frustration or, when needed, using appropriate de-escalation techniques, Defendants condoned A.B.'s assault and abuse in order to make him compliant.

112.    Defendant Anderson, through the Individual Defendants, intentionally discriminated against A.B. on the basis of disability. The above-alleged abusive conduct was

either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by the Individual Defendants, all so that Anderson would not have to provide A.B. the opportunity to participate in Anderson's programming due to the nature of his disabilities.

113.    Through these actions, Defendant Anderson, through the Individual Defendants, denied A.B. meaningful access to and excluded him from participation in disability services, and failed to provide reasonable accommodations for his disabilities.

114.    Defendant Anderson, through the Individual Defendants, failed to implement reasonable modifications or accommodations that would have allowed A.B. equal and meaningful access to its programs or services, despite having knowledge of A.B.'s disability and the necessity of such accommodations.

115.    Defendant Anderson acted with deliberate indifference to A.B.'s federally protected rights in that Defendant Anderson had actual knowledge that harm to A.B.'s rights under Section 504 was substantially likely and consciously failed to act upon that knowledge. Defendant intentionally decided to subject A.B. to unsafe conditions due to his disability rather than provide him reasonable accommodations, with full knowledge and intent to "manage" his difficult symptoms.

116.    As a direct and proximate result of Defendant Anderson's conduct, through the conduct of the Individual Defendants, A.B. has suffered significant damages, including but not limited to physical harm and emotional distress.

117.    Defendant Anderson's conscious disregard for A.B.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

118.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

### THIRD CAUSE OF ACTION
**Negligence (Against the Individual Defendants)**
**Vicarious Liability (Against Defendant Anderson)**

119.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

120.    At all relevant times, Defendants owed A.B. a duty of care and were obligated to protect his safety and security while in Anderson's custody.

121.    Defendants' negligent conduct breaching that duty of care includes the above-alleged routine physical abuse.

122.    Defendants did so while acting in the scope of their employment—*i.e.*, in the course of being responsible for managing A.B.'s health and behavioral wellbeing—and in furtherance of Anderson's business.

123.    The Individual Defendants, at various times, were on direct notice of that harmful and abusive conduct, and knew that these staff members were unfit, incompetent, dangerous, or otherwise likely to engage in conduct that would cause harm, and that such harm was reasonably foreseeable.

124.    Defendants failed to take reasonable steps to prevent the foreseeable harm.

125.    The Individual Defendants are liable for their own negligence and gross negligence.

126.    Anderson is liable for the Individual Defendants' negligence under principles of *respondeat superior*.

127.    As a direct and proximate result of Defendants' conduct, A.B. has suffered significant damages, including but not limited to physical harm, emotional distress, and economic losses.

128.    Defendants' conscious disregard for A.B.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

129.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

### FOURTH CAUSE OF ACTION
### (Against Defendant Anderson)
### Negligent Supervision/Training/Discipline/Retention

130.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

131.    At all relevant times, Defendant Anderson, through the Individual Defendants, owed a duty to A.B. to exercise reasonable care in the supervision, training, monitoring, and control of its employees, agents, or individuals under its control, to prevent foreseeable harm to others, including A.B.

132.    Defendant Anderson, through Ms. Thompson, knew that various staff members, including Garnett Collins, had harmed and abused and were actively physically harming and abusing A.B.

133.    Defendant Anderson, through Ms. Thompson, was, at various times, put on direct notice of that harmful and abusive conduct, and knew that Defendant Collins was unfit, incompetent, dangerous, or otherwise likely to engage in conduct that would cause harm, and that such harm was reasonably foreseeable.

134.    Despite this knowledge, Defendant Anderson, through Ms. Thompson, failed to adequately supervise, train, investigate, or discipline Mr. Collins, and failed to take appropriate steps to prevent or mitigate the risk of harm to others.

135.    Rather, in response to direct reports of abuse, Defendant Anderson, through Ms. Thompson, swept the issues under the rug and failed to take remedial or disciplinary measures, prioritizing personal friendships with staff members over the safety of residents.

136.    In some instances, Ms. Thompson participated in the abusive conduct by making excuses for staff members who engaged in abusive conduct, or, at minimum, tacitly approving their actions in failing to take any remedial or disciplinary action.

137.    These instances of cover-up, justifying abusive behavior, and/or tacitly approving the abuse include, but are not limited to:

    a.  Ms. Thompson's routine refusal to discipline Mr. Collins when notified of his abusive tactics;

    b.  Ms. Thompson telling a whistleblower that "what happens in Chestnut, stays in Chestnut":

    c.  Anderson's firing a whistleblower when he raised the issue of Mr. Collins' repeated instances of abuse.

138.    Anderson's and Ms. Thompson's breach of their duty of care in the supervision and control of their employees was a direct and proximate cause of the injuries and damages sustained by Plaintiffs.

139.    As a direct and proximate result of Anderson's and Ms. Thompson's conduct, A.B. has suffered significant damages, including but not limited to physical harm, emotional distress, and economic losses.

140.    Defendants' conscious disregard for A.B.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

141.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

## FIFTH CAUSE OF ACTION
### (Against Defendants Anderson and Collins)
### Assault and Battery

142.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

143.    Pursuant to CPLR § 208, Plaintiffs' claims are timely brought as the statute of limitations for New York state law claims is tolled for 10 years for individuals with disabilities. Due to the nature and severity of A.B.'s disabilities, which are ongoing, severe, and incapacitating—in particular, the fact that A.B. is autistic and has limited verbal abilities—A.B. was unable to contemporaneously report the assault and battery he was subjected to. A.B. satisfies the requirements of CPLR § 208(1), and Plaintiffs' assault and battery claims are timely.

144.    Defendant Collins, while employed by Anderson and acting within the course and scope of such employment, engaged in the above-alleged acts constituting assault and/or battery under New York law.

145.    These incidents of assault and/or battery occurred during the course of Mr. Collins' assigned duties or were reasonably incidental to the performance of those duties.

146.    Defendant Anderson, through Ms. Thompson, was, at various times, put on direct notice of that harmful and abusive conduct, and knew that these staff members were unfit, incompetent, dangerous, or otherwise likely to engage in conduct that would cause harm, and that such harm was reasonably foreseeable.

147.    Defendant Anderson and Ms. Thompson failed to take reasonable steps to prevent the foreseeable harm. Rather, these incidents of assault and battery were either explicitly encouraged by supervisory and executive-level staff, justified and excused by the same, or, at

minimum, tacitly approved by supervisory and executive-level staff in their attempts to cover up the misconduct and their failure to take any remedial or disciplinary measures.

148.    Defendant Anderson is liable for Garnet Collins' assaults and/or batteries under principles of *respondeat superior*.

149.    As a direct and proximate result of Defendants' conduct, A.B. has suffered significant damages, including but not limited to physical harm and emotional distress.

150.    Defendants' conscious disregard for A.B.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

151.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

**SIXTH CAUSE OF ACTION**
**(Against All Defendants)**
**Discrimination in Violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2)**

152.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

153.    Defendant Anderson's Chestnut House is a dwelling as defined by 42 U.S.C. § 3602(b).

154.    Defendants' conduct as hereinbefore described discriminates in the provision of services or facilities in connection with a dwelling because of disability, in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

155.    A.B.'s residence at Anderson falls under the ambit of 42 U.S.C. § 3604(f)(2)(B). A.B. was a "a person residing in . . . [a] dwelling after it is so sold, rented, or made available," *id.*, and was discriminated against "in the provision of services or facilities in connection with such dwelling, because of a handicap," *id.* § 3604(f)(2).

156.    In addition, A.B.'s residence at Anderson falls under the ambit of 42 U.S.C.

§ 3604(f)(2) because Defendant Anderson receives federal funding—i.e., Medicaid—as payment

on A.B.'s behalf, as consideration for Defendant Anderson's provision of housing.

157.    Rather than provide appropriate disability care in connection with A.B.'s

dwelling, Defendants abused, assaulted and neglected A.B., motivated in substantial part by the

nature and severity of his disabilities. Defendants' discriminatory animus was reflected in their

abusive conduct towards A.B.

158.    Defendants discriminated against A.B. on the basis of disability. The above-

alleged abusive conduct was either tacitly approved (through cover-ups and lack of discipline) or

expressly encouraged by Defendants, all so that Anderson would not have to provide A.B. with

disability services in connection with his dwelling.

159.    Through these actions, Defendants denied A.B. meaningful access to and

excluded him from participating in disability services, and failed to provide reasonable

accommodations for his disabilities.

160.    Defendants' misconduct created a hostile housing environment that they subjected

A.B. to because of his disability.

161.    As a direct and proximate result of Defendants' conduct, A.B. has suffered

significant damages, including but not limited to physical harm and emotional distress.

162.    Defendants' conscious disregard for A.B.'s safety was willful, malicious, and

cruel, meriting substantial punitive damages.

163.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys'

fees, and any other relief permitted by law.

**SEVENTH CAUSE OF ACTION**
**(Against All Defendants)**

### Hostile Living Environment and Interference in Violation of the Fair Housing Act, 42 U.S.C. §§ 3604, 3617

164.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

165.    Defendant Anderson's Chestnut House is a dwelling as defined by 42 U.S.C. § 3602(b).

166.    A.B.'s residence at Anderson falls under the ambit of 42 U.S.C. § 3604(f)(2)(B). A.B. was a "a person residing in . . . [a] dwelling after it is so sold, rented, or made available," *id.*, and was discriminated against "in the provision of services or facilities in connection with such dwelling, because of a handicap," *id.* § 3604(f)(2).

167.    In addition, A.B.'s residence at Anderson falls under the ambit of 42 U.S.C. § 3604(f)(2) because Anderson receives federal funding—i.e., Medicaid—as payment on A.B.'s behalf, as consideration for Anderson's provision of housing.

168.    Defendants had an obligation to prevent a hostile living environment and to not interfere with A.B.'s right to be free from discrimination because of the nature and severity of his disabilities in the provision of services at Anderson and in the terms, conditions and privileges of residing at Chestnut House.

169.    Defendants' conduct as hereinbefore described subjected A.B. to a hostile living environment by, inter alia, systematically failing to protect A.B. from physical abuse, assault, and neglect motivated in substantial part by the nature and severity of his disabilities, and interfered with A.B.'s right to reside at Anderson free from discrimination.

170.    The above-alleged conduct was either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by Defendants Anderson and Thompson, all so that

Anderson would not have to provide A.B. appropriate disability services in connection with his dwelling.

171.    Through these actions, Defendants denied A.B. meaningful access to and excluded him from participation in disability services, and failed to provide reasonable accommodations for his disabilities.

172.    As a direct and proximate result of Defendants' conduct, A.B. has suffered significant damages, including but not limited to physical harm and emotional distress.

173.    Defendants' conscious disregard for A.B.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

174.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

### EIGHTH CAUSE OF ACTION
### (Against All Defendants)
### Discrimination in Violation of New York State Human Rights Law

175.    Plaintiffs repeat and reallege the foregoing factual allegations as if the same were fully set forth at length herein.

176.    At all relevant times, Anderson operated a "housing accommodation" as defined by N.Y. Executive Law § 292(10) and a "publicly-assisted housing accommodation" as defined by N.Y. Executive Law § 292(11).

177.    At all times relevant hereto, the Individual Defendants were agents and/or employees of Anderson, the home's owner, lessee, sub-lessee, assignee, and/or managing agent, and/or were agents and/or employees of some other person having the right to sell, rent, or lease a housing accommodation.

178.    A.B. is disabled within the meaning of the New York State Human Rights Law.

179.    Defendants' conduct as hereinbefore described discriminates in the provision of services related to a housing accommodation, in violation of New York State Human Rights Law.

180.    Rather than provide appropriate disability care in connection with A.B.'s dwelling, Defendants abused, assaulted and neglected A.B., motivated in substantial part by the nature and severity of his disabilities. Defendants' discriminatory animus was reflected in their abusive conduct.

181.    Defendants discriminated against A.B. on the basis of disability. The above-alleged abusive conduct was either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by Defendants, all so that they would not have to provide A.B. disability services in connection with his dwelling.

182.    Through these actions, Defendants denied A.B. meaningful access to and excluded him from participating in disability services, and failed to provide reasonable accommodations for his disabilities.

183.    Defendants' misconduct created a hostile housing environment which they subjected A.B. to because of his disability.

184.    As a direct and proximate result of Defendants' conduct, A.B. has suffered significant damages, including but not limited to physical harm and emotional distress.

185.    Defendants' conscious disregard for A.B.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

186.    Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Anil Babbar and Shalini Babbar, as guardians of their son,

A.B., respectfully request judgment against Defendants as follows:

1. Awarding compensatory damages in an amount to be determined at trial.

2. Awarding punitive damages in an amount to be determined at trial.

3. Awarding attorneys' fees, costs, and disbursements in an amount to be determined at trial.

4. Awarding prejudgment interest in an amount to be determined at trial.

5. Directing such other and further relief as the Court may deem just and proper.

Dated: January 21, 2026
     New York, New York

                              EMERY CELLI BRINCKERHOFF ABADY
                              WARD & MAAZEL, LLP

                                        /s/
                              Ilann M. Maazel
                              Sara Luz Estela

                              1 Rockefeller Plaza, 8th Floor
                              New York, New York 10020
                              (212) 763-5000

                              *Attorneys for Plaintiffs Anil Babbar and*
                              *Shalini Babbar, as guardians of their son,*
                              *A.B.*